# OPERATING AGREEMENT

## OF

## 4511 DIX ST, LLC

EIN: 84-2717929

**THIS OPERATING AGREEMENT** (the "Agreement") of 4511 Dix St, LLC, a District of Columbia limited liability company (the "Company"), is made and entered into as of August 14, 2019, by and between Axis Equity Group, LLC of 2503-D North Harrison St, #304, Arlington, VA 22207 and Kempes Jean of 9200 Corporate Blvd., Suite 320, Rockville, MD 20850 (including the Managing Member, each a "Member" and collectively the "Members").

### WITNESSETH:

**WHEREAS**, the parties hereto desire to form a limited liability company pursuant to the laws of the District of Columbia for the purposes hereinafter set forth, and to establish their respective rights and obligations in connection with the limited liability company; and

**WHEREAS**, the parties agree that Axis Equity Group, LLC shall provide Sixty-Six Thousand Five Hundred ($66,500.00) cash toward the purchase of the Property; and

**WHEREAS**, the parties agree that Kempes Jean shall provide Five Thousand Dollars ($5,000.00) cash toward the purchase of the Property; and

**WHEREAS**, the parties agree that Kempes Jean shall obtain a mortgage loan of Two Hundred Five Thousand ($205,000.00) and a construction loan of Fifty-Seven Thousand Dollars ($57,000.00) on behalf of the Company toward the purchase and renovation of the Property; and

**WHEREAS**, the parties agree that Kempes Jean shall be the co-borrower, co-signer, and/or guarantor of the mortgage loan, the construction loan, and any other loan obtained on behalf of the Company, and shall pay all Carrying Costs (as defined herein); under no circumstance shall Axis Equity Group, LLC, its members or managers, be obligated to be a co-borrower, co-signer, and/or guarantor, or be obligated to pay any Carrying Costs of the Company; and

**WHEREAS**, the parties agree that Sarah Pastoriza shall be the real estate agent for the Company for the sale of the Property and shall be entitled to be reimbursed by the Company for any and all out of pocket expenses (including brokerage fees) incurred in the marketing and sale of the Property; and

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Managing Member and Members agree as follows:



EXHIBIT B

## 1. Formation

The parties have formed a limited liability company pursuant to the provisions of the District of Columbia Uniform Limited Liability Company Act of 2010 (the "Act"), for the purposes and the period and upon the terms and conditions hereinafter set forth. The parties have caused to be filed the Articles of Organization of the Company, and shall execute, acknowledge, swear to and file any other documents required under applicable law.

## 2. Name

The name of the Company shall be 4511 Dix St, LLC and all business of the Company shall be conducted under said name, or such other name as the Members from time to time may determine.

## 3. Purposes

The purposes of the Company are to acquire, own, hold, improve, manage and re-sell real property known as 4511 Dix Street NE, Washington, DC 20019 (the "Property"); to incur indebtedness, secured and unsecured; to mortgage, finance, refinance, encumber, lease, sell, exchange, convey, transfer or otherwise deal with or dispose of the Property; to enter into and perform contracts and agreements of any kind necessary to, in connection with or incidental to the business of the Company; and to carry on any other activities necessary to, in connection with or incidental to the foregoing, as the Managing Member in his discretion may deem desirable.

## 4. Place of Business

The principal place of business of the Company (and the specified office at which the records required to be maintained by the Company are to be kept) shall be at 9200 Corporate Blvd., Suite 320, Rockville, MD 20850 or at such other or additional places of business within or outside of the District of Columbia as the Managing Member from time to time may designate. The Managing Member shall notify the other Members of any change of the principal place of business and specified office.

The Company hereby designates Kempes Jean, whose post office address is 4511 Dix Street NE, Washington, DC 20019, as the Registered Agent of the Company for service of process.

The registered office and Registered Agent may be changed from time to time by the Managing Member by filing the prescribed forms with the appropriate governmental authorities.

## 5. Term

The term of the Company shall commence on the filing of the Articles of Organization of the Company and shall continue until the occurrence of an event hereinafter set forth which causes the termination of the Company.

## 6. Capital Contributions

2

Each of the Members shall contribute to the capital of the Limited Liability Company as set forth on Schedule A hereto, as amended from time to time. The Members shall not be required to make any additional capital contributions.

Each Member hereby pledges and assigns to the Company all right, title and interest of such Member in and to the Company as security for the performance of his obligations to make capital contributions as provided for above, and hereby grants to the Company all rights available to a secured party under the Uniform Commercial Code of the District of Columbia.

Except as specifically provided in this Agreement or required by law, no Member shall have the right to withdraw or reduce his contributions to the capital of the Company until the termination of the Company. No Member shall have the right to demand and receive any distribution from the Company in any form other than cash, regardless of the nature of such Member's capital contribution. No Member shall be paid interest on capital contributions to the Company.

The liability of any Member for the losses, debts, liabilities and obligations of the Company shall be limited to paying: the capital contribution of such Member when due under this Agreement; such Member's share of any undistributed assets of the Company; and (only if and to the extent at any time required by applicable law) any amounts previously distributed to such Member by the Company.

## 7. Loans and Advances by Members

If any Member shall loan or advance any funds to the Company in excess of the capital contribution of such Member prescribed herein, such loan or advance shall not be deemed a capital contribution to the Company and shall not in any respect increase such Member's interest in the Company. Any loan or advance made to the Company directly by a Member (not including funds obtained from a third-party lender) shall bear interest at fifteen percent (15%) per annum and shall be due and payable upon disposition of the Property.

Kempes Jean shall obtain a mortgage loan in the amount of Two Hundred Five Thousand ($205,000.00) and a construction loan in the amount of Fifty-Seven Thousand Dollars ($57,000.00) on the Property on behalf of the Company to purchase and renovate the Property. Kempes Jean shall be the co-borrower, co-signer, and/or guarantor of the mortgage loan, the construction loan, and any other loan obtained on behalf of the Company, and shall pay all taxes, insurance, utilities, mortgage loan carrying costs, construction loan carrying costs, and carrying costs of any other loan obtained on behalf of the Company (the "**Carrying Costs**"); under no circumstance shall Axis Equity Group, LLC, its members or managers, be obligated to be a co-borrower, co-signer, and/or guarantor, or be obligated to pay any Carrying Costs of the Company. However, Axis Equity Group, LLC shall be entitled to be reimbursed by the Company for any and all out of pocket expenses (including legal fees) incurred on behalf of the Company. If at any time Kempes Jean is unable to pay the Carrying Costs of the Company, Axis Equity Group, LLC may, in its sole discretion, loan the Company the funds to pay such Carrying Costs.

If actual costs of construction exceed $57,000.00, Kempes Jean shall be obligated to loan funds to the Company sufficient to cover the actual costs of construction ("**Construction Overage Funds**"). All costs related to Construction Overage Funds shall be the sole responsibility of Kempes Jean; under no circumstance shall the Company be liable for any costs related to Construction Overage Funds (including, but not limited to, principal, interest, and fees).

It is a material term of this Agreement that Sarah Pastoriza shall be the real estate agent for the Company for the sale of the Property and shall be entitled to be reimbursed by the Company for any and all out of pocket expenses (including brokerage fees) incurred in the marketing and sale of the Property.

## 8. Allocations and Distributions

As used in this Agreement, the terms "net profits" and "net losses" shall mean the profits or losses of the Company from the conduct of the Company's business, after all expenses incurred in connection therewith have been paid or provided for, including any allowance for depreciation or amortization of the cost of the Property. The net profits or net losses of the Company shall be determined by the Company's accountants in accordance with generally accepted accounting principles applied in determining the income, gains, expenses, deductions or losses, as the case may be, reported by the Company for federal income tax purposes.

The term "cash receipts" shall mean all cash receipts of the Company from whatever source derived, including without limitation capital contributions made by the Members; the proceeds of any sale, exchange, condemnation or other disposition of all or any part of the Property or other assets of the Company; the proceeds of any loan to the Company; the proceeds of any mortgage or refinancing of any mortgage on all or any part of the Property or other assets of the Company; the proceeds of any insurance policy for fire or other casualty damage payable to the Company; and the proceeds from the liquidation of the Property or other assets of the Company following a termination of the Company.

The term "capital transactions" shall mean any of the following: the sale of all or any part of the Property or other assets of the Company or interests therein; the refinancing or recasting of mortgages or other liabilities of the Company; the condemnation of the Property to the extent the award is not used for restoration; the receipt of insurance proceeds; and any other similar or extraordinary receipts or proceeds which in accordance with generally accepted accounting principles are attributable to capital, including transactions in connection with the termination and dissolution of the Company.

The "capital account" for each Member shall mean the account established, determined and maintained for such Member in accordance with Section 704(b) of the Internal Revenue Code and Treasury Regulation Section 1.704-1(b)(2)(iv). The capital account for each Member shall be increased by (1) the amount of money contributed by such Member to the Company, (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under

4

Section 752 of the Internal Revenue Code), and (3) allocations to such Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Trea. Reg. Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in subsection (b)(4)(i) of said Regulation, and shall be decreased by (4) the amount of money distributed to such Member by the Company, (5) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), (6) allocations to such Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (7) allocations of Company loss and deduction (or items thereof) including loss and deduction described in Trea. Reg. Section 1.704-1(b)(2)(iv)(g), but excluding items described in (6) above and loss or deduction described in subsections (b)(4)(i) or (b)(4)(iii) of said Regulation. Net profits and net losses of the Company from other than capital transactions, as of the end of any fiscal year or other period, shall be credited or charged to the capital accounts of the Members prior to any charge or credit to said capital accounts for net profits and net losses of the Company from capital transactions as of the end of such fiscal year or other period. The capital account for each Member shall be otherwise adjusted in accordance with the additional rules of Trea. Reg. Section 1.704-1(b)(2)(iv).

## Membership Interests

The "Membership Units" of each Member are set forth on Schedule A hereto, as amended from time to time.

## Cash Distributions

The cash receipts of the Company shall be applied in the following order of priority: (a) to the payment by the Company of interest or amortization on any mortgages on the Property, amounts due on debts and liabilities of the Company other than to any Member, and operating expenses of the Company; (b) to the payment of principal and interest on any loan made to the Company by any Member; and (c) One Thousand Five Hundred Dollars ($1,500.00) to be held in reserve in the Company bank account to pay accounting fees. Thereafter, the cash receipts of the Company shall be distributed among the Members as hereafter provided.

The cash receipts of the Company shall be distributed to the Members within five (5) days of closing on the sale of the Property. Except as otherwise provided in this Agreement or required by law, distributions of cash receipts of the Company shall be allocated among the Members as follows:

(1) First, to the Members in proportion to their respective capital contributions until the amount distributed to each Member from time to time equals the aggregate amount of such capital contributions; and

(2) Thereafter, to the Members in proportion to the Membership Units; provided, however, that Axis Equity Group, LLC's proportional share under this Section 8(2) shall not be less than Eleven Thousand Dollars ($11,000).

5

## Tax Allocations

The net losses and net profits of the Company shall be allocated at the end of each fiscal year of the Company among the Members in a manner such that the Capital Account balance of each Member, immediately after making such allocation, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Article 16 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their fair market value, all Company liabilities were satisfied, and the net assets of the Company were distributed to the Members immediately after making such allocation, minus (b) such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately prior to the hypothetical sale of assets. The Members may cause the Company to make a timely election under Section 754 of the Code (and a corresponding election under state and local law).

## Special Tax Allocations

Notwithstanding the preceding provisions of this Article 8, the following special allocations shall be made in the following order:

(1) <u>Minimum Gain Chargeback</u> -- Except as otherwise provided in Trea. Reg. Section 1.704-2(f), if there is a net decrease in partnership minimum gain (within the meaning of Trea. Reg. Sections 1.704-2(b)(2) and 1.704-2(d)) during any fiscal year, each Member shall be allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in partnership minimum gain, determined in accordance with Trea. Reg. Section 1.704-2(g). Allocations made pursuant to the preceding sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Trea. Reg. Sections 1.704-2(f)(6) and 1.704-2(j)(2). This provision is intended to comply with the minimum gain chargeback requirement in Trea. Reg. Section 1.704-2(f) and shall be interpreted consistently therewith.

(2) <u>Partner Minimum Gain Chargeback</u> -- Except as otherwise provided in Trea. Reg. Section 1.704-2(i)(4), if there is a net decrease in partner nonrecourse debt minimum gain attributable to a partner nonrecourse debt during any fiscal year, each Member who has a share of the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Trea. Reg. Section 1.704.2(i)(5), shall be allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Trea. Reg. Section 1.704-2(i)(4). Allocations made pursuant to the preceding sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Trea. Reg. Sections 1.704-2(i)(4) and 1.704-2(j)(2). As used herein, "partner nonrecourse debt" has the meaning set forth in Trea. Reg. Section 1.704-2(b)(4). As used herein, "partner nonrecourse

debt minimum gain" shall mean an amount, with respect to each partner nonrecourse debt, equal to the partnership minimum gain (within the meaning of Trea. Reg. Sections 1.704-2(b)(2) and 1.704-2(d)) that would result if such partner nonrecourse debt were treated as a nonrecourse liability (within the meaning of Trea. Reg. Section 1.704-2(b)(3)) determined in accordance with Trea. Reg. Section 1.704-2(i)(3). This provision is intended to comply with the minimum gain chargeback requirement in Trea. Reg. Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(3) Qualified Income Offset -- In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Trea. Reg. Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of the Company's income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any adjusted capital account deficit in such Member's capital account, as quickly as possible, provided that an allocation pursuant to this provision shall be made only if and to the extent that such Member would have an adjusted capital account deficit in such Member's capital account after all other allocations provided for in this Article 8 have been tentatively made as if this provision were not in this Agreement. As used herein, "adjusted capital account deficit" shall mean the deficit balance, if any, in a Member's capital account at the end of the relevant fiscal year after the following adjustments: (i) credit to such capital account the minimum gain chargeback which the Member is obligated to restore pursuant to the penultimate sentences of Trea. Reg. Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such capital account the items described in Trea. Reg. Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). This provision is intended to constitute a qualified income offset within the meaning of Trea. Reg. Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(4) Gross Income Allocation -- In the event any Member has a deficit capital account at the end of any fiscal year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Trea. Reg. Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be allocated items of the Company's income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this provision shall be made only if and to the extent that such Member would have a deficit in such Member's capital account in excess of such sum after all other allocations provided for in this Article 8 have been tentatively made as if this provision and the provisions of clause (3) above were not in this Agreement.

(5) Nonrecourse Deductions -- Nonrecourse deductions (within the meaning of Trea. Reg. Section 1.704-2(b)(1)) for any fiscal year shall be allocated among the Members in proportion to the Membership Units.

(6) Partner Nonrecourse Deductions -- Any partner nonrecourse deductions (within the meaning of Trea. Reg. Sections 1.704-2(b)(1) and 1.704-2(b)(2)) for any fiscal year shall be allocated to the Member who bears the economic risk of loss with

respect to the partner nonrecourse debt (within the meaning of Trea. Reg. Section 1.704-2(b)(4)) to which such partner nonrecourse deductions are attributable in accordance with Trea. Reg. Section 1.704-2(i)(1).

(7) Other Mandatory Allocations -- In the event Section 704(c) of the Internal Revenue Code or the Regulations thereunder require allocations in a manner different than that set forth above in this Article 8, the provisions of Section 704(c) and the Regulations thereunder shall control such allocations among the Members.

It is the intention of the Members that the allocations hereunder shall be deemed to have "substantial economic effect" within the meaning of Section 704 of the Internal Revenue Code and Trea. Reg. Section 1.704-1. Should the provisions of this Agreement be inconsistent with or in conflict with Section 704 of the Code or the Regulations thereunder, then Section 704 of the Code and the Regulations shall be deemed to override the contrary provisions hereof. If Section 704 or the Regulations at any time require that limited liability company operating agreements contain provisions which are not expressly set forth herein, such provisions shall be incorporated into this Agreement by reference and shall be deemed a part of this Agreement to the same extent as though they had been expressly set forth herein, and the Managing Member shall be authorized by an instrument in writing to amend the terms of this Agreement to add such provisions, and any such amendment shall be retroactive to whatever extent required to create allocations with a substantial economic effect.

## 9. Books, Records and Tax Returns

At all times during the continuance of the Company, the Managing Member shall keep or cause to be kept complete and accurate records and books of account in which shall be entered each transaction of the Company in accordance with generally accepted accounting principles.

The fiscal year of the Company for both accounting and income tax purposes shall be the calendar year. The Company shall report its operations, net income and net losses in accordance with the methods of accounting selected by the Managing Member.

The Managing Member may employ on behalf of the Company and at the expense of the Company such firm of certified public accountants as the Managing Member in his sole discretion deems appropriate to serve as the Company's accountants.

The Managing Member shall furnish to each Member, within seventy-five days after the end of each fiscal year, an annual report of the Company which shall include a balance sheet as of the end of such fiscal year; a profit and loss statement of the Company for such fiscal year; a statement of the balance in the capital account of such Member; and the amount of such Member's share of the Company's income, gain, losses, deductions and other relevant items for federal income tax purposes.

The Managing Member shall prepare or cause to be prepared all federal, state and local income tax and information returns for the Company and shall cause such tax and information returns to be filed timely with the appropriate governmental authorities. Within seventy-five days

8

after the end of each fiscal year, the Managing Member shall forward to each person who was a Member during the preceding fiscal year a true copy of the Company's information return filed with the Internal Revenue Service for the preceding fiscal year. The Managing Member shall not be liable to any Member if any taxing authority disallows or adjusts any deductions or credits in the Company's income tax or information returns.

The Managing Member is designated as the initial partnership representative for the Company for federal income tax purposes.

All such records, books of account, tax and information returns, and reports and statements, together with executed copies of this Agreement, shall at all times be maintained at the principal place of business of the Company, and shall be open to the inspection and examination of the Members or their duly authorized representatives during regular business hours. Each Member, or a duly authorized representative of such Member, may make copies of the Company's books of account and records at the expense of such Member. Any Member, at the expense of such Member, may conduct an audit of the Company's books of account and records.

The cost of preparing all of the aforesaid records, books, returns and other items shall be borne by the Company.

## 10. Bank Accounts

All funds of the Company shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Managing Member. Withdrawals from any such bank accounts shall be made only in the regular course of business of the Company and shall be made upon such signature or signatures as the Managing Member from time to time may designate.

## 11. Management of the Company

The business and affairs of the Company shall be conducted and managed by the Managing Member of the Company in accordance with this Agreement and the laws of the District of Columbia. The Members hereby designate Kempes Jean to serve as "Managing Member" for the Company.

The Managing Member shall have responsibility for the day-to-day management of the business and affairs of the Company and shall devote such time and attention as the Managing Member deems necessary to the conduct and management of the business and affairs of the Company.

The Managing Member hereby is given sole power and authority to execute instruments on behalf of the Company and to otherwise bind the Company. Unless authorized by the Managing Member, no other person shall have the power or authority to execute instruments on behalf of the Company and to otherwise bind the Company. No person, firm or corporation dealing with the Company shall be required to investigate the authority of the Managing Member or to secure the

approval of or confirmation by the Members of any act of the Managing Member in connection with the business or affairs of the Company.

Notwithstanding any other provision of this Agreement, the Managing Member shall not, without the prior written consent of the unanimous vote or consent of the Members, sell, exchange, lease, assign or otherwise transfer all or substantially all of the assets of the Company; sell, exchange, lease (other than space leases in the ordinary course of business), assign or transfer the Property; mortgage, pledge or encumber the Property other than as expressly authorized by this Agreement; prepay, refinance, modify, extend or consolidate any existing mortgages or encumbrances; borrow money on behalf of the Company; lend any Company funds or other assets to any person; confess a judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt, including claims for insurance; approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; or change the nature or character of the business of the Company.

The Managing Member shall purchase insurance against loss or damage to the Property by fire or other risks embraced by extended coverage, in amounts sufficient to prevent the Company from becoming a co-insurer, and shall maintain such other hazard and liability insurance against such risks and in such amounts as the Managing Member shall deem advisable but at least against such risks and in such amounts as customarily is maintained for similar properties in the vicinity of the Property.

The Managing Member shall be reimbursed by the Company for all direct out-of-pocket expenses incurred by the Managing Member on behalf of the Company in connection with the performance of his duties hereunder, including without limitation amounts payable by the Managing Member for office, accounting, bookkeeping and other services, materials, facilities and professional and legal services rendered or furnished to the Company, and reasonable fees and other expenses incurred in connection with any sale or refinancing of the Property.

Except as expressly provided in this Agreement, no fees, salary or other compensation shall be paid to the Managing Member for the rendition of services to the Company.

The Managing Member shall owe a fiduciary duty of loyalty and a fiduciary duty of care to the Company and its Members. Such fiduciary duty of loyalty and fiduciary duty of care shall be the same as those to which directors and officers are subject under the District of Columbia Business Corporation Act of 2010. Provided, however, that Members who are not the Managing Member shall not owe any fiduciary duty to the Company or its Members.

Except as expressly provided elsewhere in this Agreement, any decisions which are to be made by the Members, rather than the Managing Member, shall be made by the affirmative vote or consent of Members holding a majority of the Membership Units.

## 12. Assignment of Interests

10

Except as otherwise provided in this Agreement, no Member or other person holding any interest in the Company may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of his interest in the Company, including without limitation the capital, profits or distributions of the Company without the prior written consent of the other Members in each instance.

The Members agree that no Member may voluntarily withdraw from the Company without the unanimous vote or consent of the Members.

A Member may assign all or any part of such Member's interest in the allocations and distributions of the Company to any of the following (collectively the "permitted assignees"): any person, corporation, partnership or other entity as to which the Company has given consent to the assignment of such interest in the allocations and distributions of the Company by the unanimous vote or consent of the Members. An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled, unless such permitted assignee applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Member in the Company or other person holding any interest in the Company in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Managing Member, has been delivered to the Company.

No assignment or other disposition of any interest of any Member may be made if such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Company within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute. No assignment or other disposition of any interest of any Member may be made without an opinion of counsel satisfactory to the Managing Member that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable federal and state securities laws. No interest in the Company may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Managing Member and the Company shall be entitled to treat the record holder of the interest of a Member as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Managing Member the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Managing Member to establish to the satisfaction of the Managing Member that an interest has been assigned or transferred in accordance with this Agreement.

### 13. Right of First Refusal

If a Member desires to sell, transfer or otherwise dispose of all or any part of his interest in the Company, such Member (the "Selling Member") shall first offer to sell and convey such interest to the other Members before selling, transferring or otherwise disposing of such interest to any other person, corporation or other entity. Such offer shall be in writing, shall be given to every other Member, and shall set forth the interest to be sold, the purchase price to be paid, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty days after the delivery of the offer), the location within the District of Columbia at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

Within fifteen days after the delivery of said offer the other Members shall deliver to the Selling Member a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen days conclusively shall be deemed a rejection of the offer. Any or all of the other Members may elect to accept the offer, and if more than one of the other Members elects to accept the offer, the interest being sold and the purchase price therefor shall be allocated among the Members so accepting the offer in proportion to their Membership Units, unless they otherwise agree in writing.

If any or all of the other Members elect to accept the offer, then the closing of title shall be held in accordance with the offer and the Selling Member shall deliver to the other Members who have accepted the offer an assignment of the interest being sold by the Selling Member, and said other Members shall pay the purchase price prescribed in the offer.

If no other Member accepts the offer, or if the Members who have accepted such offer default in their obligations to purchase the interest, then the Selling Member within 120 days after the delivery of the offer may sell such interest to any other person or entity at a purchase price which is not less than the purchase price prescribed in the offer and upon terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled, unless such person or entity applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

If the Selling Member does not sell such interest within said 120 days, then the Selling Member may not thereafter sell such interest without again offering such interest to the other Members in accordance with this Article 13.

### 14. Admission of New Members

The Members may admit new Members (or transferees of any interests of existing Members) into the Company by the unanimous vote or consent of the Members.

As a condition to the admission of a new Member, such Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Managing Member, as

12

the Managing Member may deem necessary or desirable to effectuate such admission and to confirm the agreement of such Member to be bound by all of the terms, covenants and conditions of this Agreement, as the same may have been amended. Such new Member shall pay all reasonable expenses in connection with such admission, including without limitation reasonable attorneys' fees and the cost of the preparation, filing or publication of any amendment to this Agreement or the Articles of Organization, which the Managing Member may deem necessary or desirable in connection with such admission.

No new Member shall be entitled to any retroactive allocation of income, losses, or expense deductions of the Company. The Managing Member may make pro rata allocations of income, losses or expense deductions to a new Member for that portion of the tax year in which the Member was admitted in accordance with Section 706(d) of the Internal Revenue Code and regulations thereunder.

In no event shall a new Member be admitted to the Company if such admission would be in violation of applicable federal or state securities laws or would adversely affect the treatment of the Company as a partnership for income tax purposes.

## 15. Withdrawal Events Regarding Members and Election to Continue the Company; Disengagement

In the event of the death, retirement, withdrawal, expulsion, or dissolution of a Member, or an event of bankruptcy or insolvency, as hereinafter defined, with respect to a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company pursuant to the laws of The District of Columbia (each of the foregoing being hereinafter referred to as a "Withdrawal Event"), the Company shall terminate sixty days after notice to the Members of such Withdrawal Event unless the business of the Company is continued as hereinafter provided.

Notwithstanding a Withdrawal Event with respect to a Member, the Company shall not terminate, irrespective of applicable law, if within aforesaid sixty day period the remaining Members, by the unanimous vote or consent of the Members (other than the Member who caused the Withdrawal Event), shall elect to continue the business of the Company.

In the event of a Withdrawal Event with respect to any Member, any successor in interest to such Member (including without limitation any executor, administrator, heir, committee, guardian, or other representative or successor) shall not become entitled to any rights or interest of such Member in the Company, other than the allocations and distributions to which such Member is entitled, unless such successor in interest is admitted as a Member in accordance with this Agreement.

An "event of bankruptcy or insolvency" with respect to a Member shall occur if such Member: applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of his assets; or makes a general assignment for the benefit of creditors; or is adjudicated a bankrupt or an insolvent; or files a voluntary petition in bankruptcy or a petition or

an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, insolvency, readjustment of debt or similar law or statute, or an answer admitting the material allegations of a petition filed against him in any bankruptcy, insolvency, readjustment of debt or similar proceedings; or takes any action for the purpose of effecting any of the foregoing; or an order, judgment or decree shall be entered, with or without the application, approval or consent of such Member, by any court of competent jurisdiction, approving a petition for or appointing a receiver or trustee of all or a substantial part of the assets of such Member, and such order, judgment or decree shall continue unstayed and in effect for thirty days.

### 16. Dissolution and Liquidation

The Company shall terminate upon the occurrence of any of the following: the election by the Members to dissolve the Company made by the unanimous vote or consent of the Members; the occurrence of a Withdrawal Event with respect to a Member and the failure of the remaining Members to elect to continue the business of the Company as provided for in Article 15 above; or any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Company.

The liquidation of the Company shall be conducted and supervised by the Managing Member or if there be none then by a person designated for such purposes by the affirmative vote or consent of Members holding a majority of the Membership Units (the "Liquidating Agent"). The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Company in accordance with this Agreement.

Promptly after the termination of the Company, the Liquidating Agent shall cause to be prepared and furnished to the Members a statement setting forth the assets and liabilities of the Company as of the date of termination. The Liquidating Agent, to the extent practicable, shall liquidate the assets of the Company as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Company shall be applied and distributed in the following order of priority: (a) to the payment of the expenses of liquidation and the debts and liabilities of the Company, other than debts and liabilities to Members; (b) to the payment of debts and liabilities to Members; (c) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to an attorney-at-law admitted to practice in the District of Columbia as escrowee, to be held for a period of two years for the purpose of payment of the aforesaid liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as hereinafter provided; (d) to the Members in proportion to their respective capital contributions until the amount distributed to each Member from time to time equals the aggregate amount of such capital contributions; and (e) to the Members in proportion to the Membership Units.

The liquidation shall be complete within the period required by Trea. Reg. Section 1.704-1(b)(2)(ii)(b).

If the Liquidating Agent shall determine that it is not practicable to liquidate all of the assets of the Company, the Liquidating Agent may retain assets having a fair market value equal to the amount by which the net proceeds of liquidated assets are insufficient to satisfy the debts and liabilities referred to above. If, in the absolute judgment of the Liquidating Agent, it is not feasible to distribute to each Member his proportionate share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Member in such manner as the Liquidating Agent shall determine to be fair and equitable, taking into consideration the basis for tax purposes of each asset.

A taking of all or substantially all of the Property by condemnation or eminent domain shall be treated as a sale of the Property upon the dissolution of the Company. In such event any portion of the Property not so taken shall be sold, and the proceeds of such sale and the award for such taking shall be distributed in the manner provided for in this Article 16. In the event of a sale of the Property or a taking of less than substantially all of the Property, which sale does not result in a termination or dissolution of the Company, the proceeds of such sale and the award for such taking shall be distributed in the manner provided for in this Article 16.

For purposes of allocating gain on the sale of the Property and other assets of the Company, gain shall be first allocated to the Members to the extent cash or other property was distributed to them pursuant to this Article 16 and the balance of such gain shall be allocated in proportion to the Membership Units.

Upon compliance with the distribution plan, the Members shall cease to be such, and the Managing Member shall execute, acknowledge and cause to be filed such certificates and other instruments as may be necessary or appropriate to evidence the dissolution and termination of the Company.

## 17. Representations of Members

Each of the Members represents, warrants and agrees that the Member is acquiring the interest in the Company for the Member's own account for investment purposes only and not with a view to the sale or distribution thereof; the Member, if an individual, is over the age of 21; if the Member is an organization, such organization is duly organized, validly existing and in good standing under the laws of its state of organization and that it has full power and authority to execute this Agreement and perform its obligations hereunder; the execution and performance of this Agreement by the Member does not conflict with, and will not result in any breach of, any law or any order, writ, injunction or decree of any court or governmental authority against or which binds the Member, or of any agreement or instrument to which the Member is a party; and the Member shall not dispose of such interest or any part thereof in any manner which would constitute a violation of the Securities Act of 1933, the Rules and Regulations of the Securities and Exchange Commission, or any applicable laws, rules or regulations of any state or other governmental authorities, as the same may be amended.

### 18. Notices

All notices, demands, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder shall be in writing and shall be deemed to have been properly given if sent by Federal Express courier or by registered or certified mail, return receipt requested, with postage prepaid, addressed as follows: (a) if to the Company, to the Company c/o the Managing Member at his address first above written or to such other address or addresses as may be designated by the Company or the Managing Member by notice to the Members pursuant to this Article 18; (b) if to the Managing Member, to the Managing Member at his address first above written or to such other address or addresses as may be designated by the Managing Member by notice to the Company and the Members pursuant to this Article 18; and (c) if to any Member, to the address of said Member first above written, or to such other address as may be designated by said Member by notice to the Company and the other Members pursuant to this Article 18. Each Member shall keep the Company and the other Members informed of such Member's current address.

### 19. Arbitration

Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the District of Columbia, pursuant to the commercial arbitration rules then in effect of JAMS (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The prevailing party shall be reimbursed by the losing party for all costs and expenses, including reasonable attorneys' fees, incurred in connection with arbitration and in enforcing and collecting any judgment rendered therein.

### 20. Amendments

This Agreement may not be altered, amended, changed, supplemented, waived or modified in any respect unless in a signed writing and agreed to by the unanimous vote or consent of the Members.

### 21. Miscellaneous

This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the District of Columbia.

Every provision of this Agreement is intended to be severable. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

The captions in this Agreement are for convenience only and are not to be considered in construing this Agreement. All pronouns shall be deemed to be the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require. References to a person or persons shall include partnerships, corporations, limited liability companies, unincorporated associations, trusts, estates and other types of entities. The Managing Member and the Members collectively are referred to herein as the Members. Any one of the Members is referred to herein as a Member. References to the Internal Revenue Code shall mean the Internal Revenue Code of 1986, as amended, and any successor or superseding federal revenue statute.

This Agreement, and any amendments hereto may be executed in counterparts all of which taken together shall constitute one agreement.

This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof. It is the intention of the Members that this Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Agreement provides for the incorporation of federal income tax rules or is expressly prohibited or ineffective under the Act, this Agreement shall govern even when inconsistent with, or different from, the provisions of any applicable law or rule. To the extent any provision of this Agreement is prohibited or otherwise ineffective under the Act, such provision shall be considered to be ineffective to the smallest degree possible in order to make this Agreement effective under the Act. If the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Subject to the limitations on transferability contained herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and assigns.

No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

## 22. Independent Counsel

This Agreement was prepared by Dunlap, Bennett & Ludwig PLLC. The parties hereto acknowledge that Dunlap, Bennett & Ludwig PLLC is counsel to Axis Equity Group, LLC and not Kempes Jean. Kempes Jean acknowledges that this Agreement is of great legal significance and that he has had the opportunity to review such documents with legal counsel of his choice.

\*\*\*

# OPERATING AGREEMENT

## OF

## 4511 DIX ST, LLC

### SCHEDULE A

Names, Addresses, Contributions
and Membership Units of Members

| Name and Address | Contributions | Number of Membership Units |
|---|---|---|
| Axis Equity Group, LLC<br>2503-D North Harrison St #304<br>Arlington, VA 22207 | $66,500.00 | 25 |
| Kempes Jean<br>9200 Corporate Blvd.,<br>Suite 320,<br>Rockville, MD 20850 | $5,000 | 75 |
| Totals | $71,500 | 100 |

S-1

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

Axis Equity Group, LLC

*/s/ Kompes Jean*

Kompes Jean

[Signature Page to 4511 Dix St, LLC Operating Agreement]